UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MICHELLE COLLINS, INDIVIDUALLY AND | * | CIVIL ACTION |
| AS PERSONAL REPRESENTATIVE OF THE ESTATE | * | |
| OF MICHAEL COLLINS | * | |
| | * | |
| VERSUS | * | NO. 14-1900 |
| | * | |
| A.B.C. MARINE TOWING, L.L.C. AND | * | SECTION: "L" (3) |
| BOARD OF COMMISSIONERS PORT | * | |
| OF NEW ORLEANS | * | |

**ORDER & REASONS**

Before the Court are four motions: (1) Third-Party Defendants' and Declaratory Counter-Claimants, Certain Underwriters at Lloyd's, London's ("Excess Underwriters") Motion for Summary Judgment as to the claim for coverage by A.B.C. Marine Towing, LLC ("ABC Marine") (R. Doc. 67)[1]; (2) ABC Marine's Cross-Motion for Partial Summary Judgment (R. Doc. 141); (3) Excess Underwriters' Motion for Partial Summary Judgment as to Boh Bros. Construction Co., L.L.C.'s ("Boh Bros.") first-party property damage claims (R. Doc. 155); and (4) Excess Underwriters' Motion for Partial Summary Judgment as to tort liability coverage (R. Doc. 156). Having reviewed the parties' briefs and the applicable law, the Court now issues this Order and Reasons.

**I. BACKGROUND**

This case arises out of a fatal allision with the Florida Avenue Bridge, which spans the Inner Harbor Navigational Canal in Orleans Parish, Louisiana. On, or about, August 12, 2014, the M/V CORY MICHAEL ("CORY MICHAEL") was towing the 4600 Ringer Crane Barge and Manitowic 4600 Ringer Crane (collectively the "Crane Barge") through the Canal from the

---

[1] This motion was originally filed as a Motion for Judgment on the Pleadings and thereafter converted by the Court to a Motion for Summary Judgment.

Intercostal waterway towards the Mississippi River.  The COREY MICHAEL was owned and operated by ABC Marine whereas the Crane Barge was owned by Boh. Bros.  At approximately midnight on August 13, 2014, the mast of Crane Barge allided with the bridge, causing the crane boom to fall onto the pilot house from which Michael Collins was operating the CORY MICHAEL, resulting in his death.  Several other crew members claim injury from this allision.

At the time of the incident, ABC Marine had a Master Service Agreement ("MSA") with Boh Bros., regarding the chartering of vessels to Boh Bros.  Specifically, the MSC contained the following defense and indemnity obligations:

> OWNER [ABC Marine] hereby agrees to defend, indemnify, and hold harmless BOH BROS.. from and against any and all demands, liabilities, claims, suits, judgments, proceedings, orders, causes of action, damages, losses, costs and expenses…whether on account of bodily injury to or death of any person , property damage (including, but not limited to any immovable or movable property of BOH BROS. or others, whether now in existence or hereinafter acquired or constructed)… regardless of the underlying legal or equitable theory, and howsoever and whenever the same may arise, be caused or be claimed, incurred by, asserted against, suffered by or claimed against or sought from BOH BROS. that arise directly or indirectly out of, results from or is the (sic) connection with [ABC Marine's] activities relating to or the operations of the Vessel or the performance of this Agreement.  [ABC Marine's] activities relating to or the operations of the Vessel or the performance of this Agreement.  [ABC Marine's] defense and indemnity obligations hereunder shall apply and be binding on [ABC Marine] even if it is alleged or even proven that the fault, negligence or liability, in whole or in part, of BOH BROS. played any part in causing or contributing to the incident or claim giving rise to the request for defense and indemnification by BOH BROS…

Master Services Contract § 11, attached as Exhibit A to R. Doc. 155.

ABC Marine also had several insurance policies in effect, both primary and excess, upon which ABC Marine made demands for coverage and indemnity for Boh Bros.' claim against ABC following the underlying incident.  The primary underwriters accepted coverage for Boh Bros. claim against ABC Marine and at present are finalizing a settlement agreement.  At issue in the present motions is policy number TMU-405821 ("Excess Policy") issued by the Excess

Underwriters to ABC Marine, for a term of one-year beginning May 5, 2014.  The Excess Policy is written to provide coverage for ABC Marine's business: "Insured operates 2 tugs and 1 pushboat involved in oilfield construction and/or fleeting activities." (R. Doc. 67-3 at 1).  On March 24, 2015, ABC Marine filed a Third-Party Complaint against Excess Underwriters with respect to damage to the Crane Barge, alleging that the "Excess Policy provides excess property damage, protection and indemnity, collision and towers liability, contractual and other coverages, with limits of at least an additional $9,000,000.00 on top of the primary coverage of ABC Marine's underlying policies." Id. at ¶8.

## II.     PRESENT MOTIONS

Three motions for summary judgment by the Excess Underwriters and one cross-motion for summary judgment by ABC Marine are before this Court.  The disagreement at the center of these four motions is whether the Excess Policy provides coverage for damage to the Crane Barge owned by Boh Bros. that was in the tow of ABC Marine's CORY MICHAEL at the time of the incident underlying the suit.  The Excess Underwriters argue that the Excess Policy excludes coverage to ABC Marine for damage to property in its "care, custody or control," which includes Boh Bros.' Crane Barge.  ABC Marine argues that the "care, custody, or control" provision does not exclude coverage for ABC Marine's exposure as a *tower*, for property damage to a third party tow.  As this disagreement is dispositive to all four motions, the Court will analyze the motions as one.

## III.    LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477

U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.,* 530 F.3d 395, 398 (5th Cir.2008).

Under Federal Rule of Civil Procedure 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 322. When the moving party has met its Rule 56(c) burden, "[t]he non-movant cannot avoid summary judgment ... by merely making 'conclusory allegations' or 'unsubstantiated assertions.'" *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir.2002) (quoting *Little*, 37 F.3d at 1075). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little,* 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta,* 530 F.3d at 399.

## IV. LAW AND ANALYSIS

### A. Applicable Law

It is indisputable and, in fact, both parties agree, that Louisiana law governs the construction of marine insurance policies unless displaced by a controlling federal maritime law. *Ingersoll-Rand Financial Corp. v. Employers Ins. Of Wausau*, 771 F.2d 910, 912 (5th Cir. 1985);

*Fireman's Fund Ins. Co. v. Wilburn Boat Co.*, 300 F.2d 631, 633 (5th Cir. 1991); *Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882 (5th Cir. 1991).  Moreover, the parties further agree that any dispute concerning this insurance would be interpreted according to Louisiana law. (R. Docs. 67 at 8, 113 at 6).

Under Louisiana law, "[a]n insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code." *Cadwallader v. Allstate Ins. Co.,* 848 So.2d 577, 580 (La.2003). The Louisiana Civil Code provides that "[i]nterpretation of a contract is the determination of the common intent of the parties." La. Civ.Code Ann. art. 2045 (1987); *see also Cadwallader,* 848 So.2d at 580; *La. Ins. Guar. Assoc. v. Interstate Fire & Cas. Co.,* 630 So.2d 759, 763 (La.1994). An insurance contract must be "construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to or made a part of the policy." La.Rev.Stat. Ann. § 22:654 (2004). Interpretation of an insurance contract generally involves a question of law. *Bonin v. Westport Ins. Corp.,* 930 So.2d 906, 910 (La.2006) (citing *Robinson v. Heard,* 809 So.2d 943, 945 (La.2002)); *see also La. Ins. Guar. Assoc.,* 630 So.2d at 764.

"The words of a contract must be given their generally prevailing meaning." La. Civ.Code Ann. art. 2047 (1987); *see also Cadwallader,* 848 So.2d at 580. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ.Code Ann. art. 2046 (1987). "If the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written." *Cadwallader,* 848 So.2d at 580.  Where, however, an insurance policy includes ambiguous provisions, the "[a]mbiguity ... must be resolved by construing the

policy as a whole; one policy provision is not to be construed separately at the expense of disregarding other policy provisions." *La. Ins. Guar. Ass'n,* 630 So.2d at 763 (citing La. Civ.Code Ann. art. 2050 (1987) ("Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.")). "Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract." La. Civ.Code Ann. art. 2048 (1987). "A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." *Id.* art. 2049 (1987).

Ambiguity may also be resolved through the use of the reasonable-expectations doctrine—i.e., "by ascertaining how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered." *La. Ins. Guar. Ass'n,* 630 So.2d at 764 (quoting *Breland v. Schilling,* 550 So.2d 609, 610–11 (La.1989)). "The court should construe the policy 'to fulfill the reasonable expectations of the parties in light of the customs and usages of the industry.'" *Id.* (quoting *Trinity Indus., Inc. v. Ins. Co. of N. Am.,* 916 F.2d 267, 269 (5th Cir.1990)). "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." La. Civ.Code Ann. art. 2053 (1987).

"If after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the drafter, or, as originating in the insurance context, in favor of the insured." *La. Ins. Guar. Ass'n,* 630 So.2d at 764. Article 2056 of the Louisiana Civil Code provides: "In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the

other party." La. Civ.Code Ann. art. 2056 (1987). "Under this rule of strict construction, equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer." *Cadwallader,* 848 So.2d at 580. "That strict construction principle applies only if the ambiguous policy provision is susceptible to two or more *reasonable* interpretations; for the rule of strict construction to apply, the insurance policy must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable." *Id.* The fact that a term is not defined in the policy itself does not alone make that term ambiguous. *Am. Deposit Ins. Co. v. Myles,* 783 So.2d 1282, 1287 (La.2001). "An insurance contract, however, should not be interpreted in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or restrict its provisions beyond what is reasonably contemplated by unambiguous terms or achieve an absurd conclusion." *Cadwallader,* 848 So.2d at 580. "Courts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms." *Id.*

### B. Analysis

The claims asserted against ABC Marine fall within the insuring agreement of the Excess Policy, which provides that "Excess Underwriters agree to indemnify ABC Marine "by reason of liability: (a) imposed upon the 'Insured' by law or (b) assumed by the 'Insured' under an 'Insured Contract', for damages in respect of: [ ] (ii) 'Property Damage'". (R. Doc. 67-3 at 11). Property damage is defined to "mean physical loss of, physical damage to or physical destruction of tangible property of a 'Third Party', including loss of use of the tangible property so lost, damaged or destroyed." *Id.* at 26. Given that Boh Bros. made a claim against ABC Marine for damage to Boh Bros. property, any amount ABC Marine owes for damage to the Crane Barge necessarily falls within the insuring agreement. Thus, the burden shifts to the Excess

Underwriters to prove an exclusionary provision applies. To do so, Excess Underwriters assert that because the Crane Barge was being towed by ABC Marine's COREY MICHAEL, the "care, custody or control" exclusion applies. This conclusion is contrary to law for the following reasons: (i) the "care, custody or control" exclusion is not applicable to towage contracts and (ii) the contract language is ambiguous at best and therefore must be resolved in favor of the insured.

### a. The "Care, Custody and Control Provision Does Not Apply to Towage Contracts

It is undisputed that the Excess Policy provides an exclusion for "'Property Damage' to property [ ] in the care, custody or control of the 'Insured'". (R. Doc. 67-3 at 18). What is disputed is whether this exclusion applies to ABC Marine's towing operations. The starting point for resolution of this dispute can be found in *Stevens v. the White City*, 285 U.S. 195 (1932). As explained by the Supreme Court in *Stevens*, under a towage contract, the tug is not a bailee of the vessel in tow or its cargo. *Stevens* 285 U.S. at 200 ("A contract merely for towage does not require or contemplate such a delivery as is ordinarily deemed essential to bailment."). Moreover, the Fifth Circuit has interpreted *Stevens* to mean that a towage contract "does not put the tower in possession of the vessel or cargo." *Clifford v. Merritt-Chapman & Scott Corp.*, 57 F.2d 1021, 1025 (5th Cir. 1932); *see also Houma Well Serv., Inc. v. Tug Capt. O'Brien*, 312 F. Supp. 257, 260 (E.D. La. 1970) ("The tower, on the other hand, is not a bailee. He neither takes possession of the vessel nor responsibility for its cargo or crew; he undertakes merely to tow it.").

ABC Marine argues that this distinction between towage and bailment is significant because bailment (or, in Louisiana, deposit) is synonymous with care, custody, and control whereas towage is not. The United States Court of Appeals for the Sixth Circuit embraces this

understanding explaining that "[c]ustomarily when one speaks of something being in the 'care, custody, or control' of another, reference is had to a legal relationship akin to that of ownership, tenancy or bailment." *Am. Cas. Co. v. Timmons*, 352 F.2d 563, 567 (6th Cir. 1965)(quoting *Innis v. McDonald*, Ohio Com.Pl., 150 N.E.2d 441, aff'd Ohio App., 150 N.E.2d 447 (1956)). Moreover, the Fifth Circuit and Louisiana law reinforces the understanding that bailment/deposit is generally equated with control. *See e.g., Navarro Pecan v. Penn America Ins.,* 34 Fed.Appx. 963 (5th Cir.2002)(holding that "because [the insured] is a depositary ... it is deemed to have 'care, custody or control' over the personal property it accepts for deposit."); *Crompton Greaves, Ltd. v. Shippers Stevedoring Co.,* 921 F. Supp. 2d 697, 726 (S.D. Tex. 2013)("The creation of a bailment requires that possession and control over an object pass from the bailor to the bailee."). Although the Excess Underwriters cite to cases where the tower is found to have "control" of its tow, these cases are distinguishable from the present case. For example, the Excess Insurers cite to *United States Fire Ins. Co.v. Gulf States Marine and Mining Co.*, 262 F.2d 565, 567 (5th Cir. 1959) where the Fifth Circuit found that the "barge was in charge and under the complete control of the tug." However, in *United States Fire Ins.*, the barge was a bareboat charter i.e., the tug chartered (and became the owner *pro hac vice*) the barge. This is unlike the present case because ABC Marine did not charter the Barge Crane; it merely contracted with Boh Bros. to provide its towage services to transport the Barge Crane.

While the Court both recognizes that there is no Fifth Circuit law directly on point to the issue and appreciates Excess Insurers' position that courts have found tugs to be in control of barges in particular instances, the "purpose of liability insurance is to afford the insured protection from damage claims." *Reynolds v. Select Properties, Ltd.*, 634 So. 2d 1180, 1183 (La. 1994). Therefore, "a provision which seeks to narrow the insurer's obligation is strictly

construed against the insurer, and, if the language of the exclusion is subject to two or more reasonable interpretations, the interpretation which favors coverage must be applied." *Id.* Given these principles of construction and the reasonableness of ABC Marine's position that "care, custody, and control" is synonymous with bailment and not towage, the Court finds that the exclusion does not apply to ABC Marine's towage of the Crane Barge.

### b. The Insurance Contract Is Ambiguous and Must be Construed in Favor of the Insured

Although the Court need not analyze the issue further, there is ample additional evidence that coverage of property damage to the Crane Barge is afforded by the Excess Policy. Namely, reading the policy to exclude such coverage would lead to absurd consequences in violation of Louisiana law. La. Civ.Code Ann. art. 2046 (1987) ("When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."). Two months after denying coverage to ABC Marine, Trident Marine Managers, the managing agent performing underwriting activities on behalf of the Excess Underwriters, circulated Endorsement No. 1 to numerous parties, including ABC Marine. Endorsement No. 1 effectively eliminated the "care, custody or control" exclusion. *See* (R. Doc. 53-3 at 3). Shortly thereafter, Trident Marine sent ABC Marine an email stating:

> "please let this email serve as a RESCINDING notice on endorsement #1… this was erroneously issued to the policy after specific instructions from our underwriter to NOT issue it to ABC Marine. There were hundreds of these endorsements issued and while we set this file to the side to not be issued, somehow it did and got sent out."

(R. Doc. 53-3 at 1). The notion that Excess Underwriters gratuitously and retroactively amended every marine towage policy to extend tower's liability coverage where none existed before is not credible. Out of approximately 200 policyholders, ABC Marine was the only one denied the benefit of the endorsement. Moreover, the fact that Excess Underwriters felt compelled to issue

the endorsement in order to clarify coverage issues related to the "care, custody or control" exclusion for towing operations is strong evidence of the ambiguity inherent in the exclusion.

Considering the foregoing, the contract language is ambiguous at best. Thus, the ambiguity must be resolved in favor of the insured "by ascertaining how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered." *See La. Ins. Guar. Ass'n,* 630 So.2d at 764 (quoting *Breland v. Schilling,* 550 So.2d 609, 610–11 (La.1989)). "The court should construe the policy 'to fulfill the reasonable expectations of the parties in light of the customs and usages of the industry.' " *Id.* (quoting *Trinity Indus., Inc. v. Ins. Co. of N. Am.,* 916 F.2d 267, 269 (5th Cir.1990)). ABC Marine did not reasonably expect that its purchase of $9 million in excess coverage provided tower's liability so long as there was no physical damage to the tow. In fact, the P&I Policy and the Hull Policy contain similar "care, custody or control" exclusions and nonetheless recognized that damage to a non-owned vessel, while being towed by ABC Marine (a *towing* company), is covered under the policies. Further, as evidenced by the Excess Underwriters prompt issuance of Endorsement No. 1, it is the reasonable expectation within the marine towage industry that when a tower pays its premium in full for liability coverage, physical damage to the tow is covered. A contrary interpretation would substantially limit coverage for a tower's business activities, a result disfavored by the Court.

### IV. CONCLUSION

Accordingly, IT IS ORDERED that the Excesss Underwriters' Motions for Summary Judgment and Partial Summary Judgment (R. Docs. 67, 155, 156) are DENIED and ABC Marine's Cross-Motion for Partial Summary Judgment (R. Doc. 141) is GRANTED.

New Orleans, Louisiana this 17th day of August, 2015.

_____
United States District Judge