UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MICHELLE COLLINS, INDIVIDUALLY AND | * | CIVIL ACTION |
| AS PERSONAL REPRESENTATIVE OF THE ESTATE | * | |
| OF MICHAEL COLLINS | * | |
| | * | |
| VERSUS | * | NO. 14-1900 |
| | * | |
| A.B.C. MARINE TOWING, L.L.C. AND | * | SECTION: "L" (3) |
| BOARD OF COMMISSIONERS PORT | * | |
| OF NEW ORLEANS | * | |

**ORDER & REASONS**

Before the Court is a Motion for Summary Judgment by the Board of Commissioners' of the Port of New Orleans (the "Board") seeking dismissal of the claims for punitive damages. (R. Doc. 215). The Court has reviewed the briefs and the applicable law and now issues this Order and Reasons.

**I.   BACKGROUND**

   **a. Statement of Facts**

This case arises out of a fatal allision with the Florida Avenue lift bridge, which spans the Inner Harbor Navigational Canal in Orleans Parish, Louisiana. On, or about, August 12, 2014, the M/V COREY MICHAEL ("COREY MICHAEL") was towing the 4600 Ringer Crane Barge and Manitowic 4600 Ringer Crane (collectively the "Crane Barge") through the Canal from the Intercoastal Waterway towards the Mississippi River. The COREY MICHAEL was owned and operated by ABC Marine Towing, L.L.C ("ABC Marine") whereas the Crane Barge was owned by Boh Bros. Construction Co. ("Boh Bros."). At approximately midnight on August 13, 2014, the mast of Crane Barge allided with the bridge, causing the crane boom to fall onto the pilot

house from which Captain Michael Collins was operating the CORY MICHAEL, which resulted in his death.

In 2004, the current Florida Avenue lift bridge (the "Bridge") was installed to replace the bascule drawbridge. (R. Doc. 215-2 at 1). Following the installation of the current lift bridge, Barnes Electric, the company charged with the maintenance and repair of the Bridge, trained the existing bridge tenders on the proper operation of the new Bridge. *Id.* The parties dispute the substance of this training. (R. Doc. 221-7 at1). According to Charles Johnson ("Johnson"), the Board's Manager of Bridge Operations and Maintenance, Barnes Electric trained the bridge tenders to raise the bridge to its maximum height on each opening and placed a written set of step-by-step procedures for the operation of the Bridge on the operator's console in the Bridge tender's house. (R. Doc. 215-2 at 1). However, according to the testimony of the bridge tenders, there were no step-by-step instructions on the bridge console; and, an email from the Board's Manager of Engineering Services indicates that Barnes instructed the bridge tenders that raising the bridge to its maximum height once a day was sufficient. (R. Doc. 221-7 at 1).

The Bridge's Operator Manual, which became effective in 1999 (when the bascule bridge was in operation) and was not revised until after the allision, specified that the Bridge be opened to its fullest extent for each opening. (R. Doc. 215-2 at 2). However, several bridge tenders testified that they did not review any operating or policy manuals as part of their bridge tender training. (R. Doc. 221-7 at 2). The parties also dispute when Johnson would turn over the training of a newly hired bridge tender to a senior bridge tender. *Id.* at 3. At the very least, Johnson would turn over the training to a senior person after determining that the hire was timely and showed up for work as expected. *Id.* After training had been turned over to the senior bridge tender, Johnson's oversight over training consisted of discussions between him and the

senior bridge operator regarding whether the new bridge tender was learning how to operate the bridge and whether the new tender was becoming comfortable with the job. (R. Doc. 215-2 at 3). It is disputed whether or not Johnson would perform any type of job evaluation of the newly hired bridge tenders. (R. Doc. 221-7 at 3).

The Bridge was designed to allow the lift span to rise to a maximum height of 157 feet. (R. Doc. 215-2 at 3). However, the Bridge had chronic mechanical issues that affected its ability to raise to its maximum vertical height. (R. Doc. 215-1 at 6). As explained by the Board's Bridge Engineer, Randy Songy, two problems led to the mechanical issues: the limit switches and the resolvers. *Id.* The limit switches are devices that stop the Bridge from being raised beyond its capacity. (R. Doc. 215-2 at 3). When the limit switch malfunctions, the effect is that the Bridge is allowed to rise beyond its maximum height of 157 feet, resulting in the Bridge damaging itself. *Id.* The resolvers are devices that are attached to the mechanical parts that lift each end of the Bridge. *Id.* The resolvers feed information back to the computer, which controls the motors to keep the Bridge level as it rises, thus preventing the Bridge from skewing. *Id.* The problems with the limit switches and resolvers are related. *Id* at 4. When they both malfunction, the Bridge tilts, and the malfunctioning limit switch fails to prevent the elevated side of the Bridge from rising past the limit. *Id.*

Rather than risk damage caused by skewing, bridge tenders stopped raising the Bridge to its maximum height. The parties dispute how this practice came to be. Catherine Dunn ("Dunn"), the Director of Port Development, testified that she understood that the tenders were instructed to raise the Bridge within two feet of its maximum height. (R. Doc. 215-6 at 4). However, Dunn also testified that Johnson informed her that he instructed the tenders to add 15-20 feet above the clearance requested by vessel captains. (R. Doc. 221-4 at 17-18). Three

tenders confirmed this practice, testifying that they were trained to ask a vessel for their desired clearance and then raise the Bridge several feet above the requested height. (R. Doc. 221-7at 3-4).

On the night of August 13, 2014, the bridge tender, Brandy Craft ("Craft") was following the practice, created, implemented and used by other bridge tenders, of opening the Bridge to a height requested by the transiting vessel plus a safety margin. (R. Doc. 215-2 at 4). According to Craft, Captain Collins of the CORY MICHAEL called Craft and asked for a 68 foot opening. *Id.* at 5. There is no corroboration that this conversation occurred. (R. Doc. 221-7 at 4). However, it was not unusual for a tender to obtain a vertical clearance from a vessel captain. *Id.* Craft then proceeded to raise the Bridge to 72 feet. *Id.* at 5. Craft halted the Bridge because she believed that it was proper procedure to stop the Bridge when a vessel was transiting underneath. The mast of the Manitowoc 4600 Ringer Crane aboard the barge was 86 and a half feet tall. (R. Doc. 215-2 at 5). Unfortunately, because the Bridge was elevated only to 72 feet, the mast of the crane came into contact with the Bridge, causing the cable suspended boom to collapse on the raised pilot house, over which the boom was positioned. The weight of the collapsing boom crushed the elevated pilot house of the COREY MICHAEL, and killed its occupant, Captain Michael Collins. In addition, Boh Bros.' 4600 Ringer Crane Barge sustained heavy damage.

### b. Procedural History

Decedent's widow, Michelle Collins, sued ABC Marine as decedent's Jones Act employer/vessel owner alleging negligence under the Jones Act, 46 U.S.C. § 30104, et seq., and vessel unseaworthiness; sued Boh Bros. as owner of the Crane Barge alleging general maritime law negligence; and sued the Board as owner and operator of the Bridge alleging general maritime law negligence. Following discovery, on July 8, 2015, Michelle Collins, individually

and as personal representative of decedent Michael Collins filed her Second Amended Complaint, and Boh Bros. filed its Second Supplemental Answer, Cross-claim, and Third-Party Complaint. (R. Docs. 148, 150). In both second amended pleadings, Michelle Collins and Boh Bros. ("Claimants") allege gross negligence by the Board and seek punitive damages. (R. Doc. 148). The Board has brought the present motion for summary judgment to dismiss the Claimants' claims for punitive damages arguing that punitive damages are not recoverable under the circumstances.

## II.     LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.,* 530 F.3d 395, 398 (5th Cir.2008).

Under Federal Rule of Civil Procedure 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 322. When the moving party has met its Rule 56(c) burden, "[t]he non-movant cannot avoid summary judgment ... by merely making 'conclusory allegations' or 'unsubstantiated assertions.'" *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir.2002) (quoting *Little*, 37 F.3d at 1075). "The mere existence of a scintilla of evidence in

support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little,* 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta,* 530 F.3d at 399.

### III. PUNITIVE DAMAGES UNDER GENERAL MARITIME LAW

Punitive damages may be awarded under General Maritime Law against a non Jones Act defendant who has acted willfully and wantonly, in reckless disregard of, or with indifference to, the rights of the plaintiff. Fifth Circuit Jury Instructions, Sec. 4.10 (2006); *see also Complaint of Merry Shipping, Inc.,* 650 F.2d 622 (5th Cir.1981); *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 493-494 (2008). Because punitive damages are designed to punish the wrongdoer, gross negligence, as opposed to simple negligence, is required. *Miles v. Melrose*, 882 F.2d 976, 989 (5th Cir. 1989) *aff'd sub nom. Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990). Punitive damages are "not a favorite in the law…but may be imposed for that conduct which manifests reckless or callous disregard for the rights of others." *Maritrans Operating Partners v. Diana T*, No. CIV. A. 97-1916, 1999 WL 144458, at *7 (E.D. La. Mar. 15, 1999) (citing *Protectus Alpha Navigation Co., Ltd. v. North Pacific Grain Growers, Inc.,* 767 F.2d 1379 (9th Cir.1985)).

Additionally, in *Exxon Shipping v. Baker*, the Supreme Court held that punitive damages could be awarded in maritime cases for property damages resulting from defendant's reckless action. 554 U.S. 471 (2008). Reckless conduct, like gross negligence, falls between intent to do wrong and ordinary negligence. *Id.* at 493. Furthermore, the existence of gross negligence need not rest upon a single act or omission, but may result from a combination of negligent acts or

omissions, and many circumstances and elements may be considered in determining whether an act constitutes gross negligence. Patrick H. Martin, *The BP Spill and the Meaning of "Gross Negligence or Willful Misconduct"*, 71 La. L. Rev. 957, 998 (2011).

However, even if there is willful misconduct, gross negligence, or recklessness supporting a claim for punitive damages, such a claim will not necessarily stand against an employer. In *P & E Boat Rentals*, the Fifth Circuit considered, for the first time, whether a principal is liable for punitive damages when the wanton conduct is committed by an agent. 872 F.2d 642, 650 (5th Cir. 1989). After consideration of the relevant jurisprudence on the issue, the Fifth Circuit held as follows:

> punitive damages may not be imposed against a corporation when one or more of its employees decides on his own to engage in malicious or outrageous conduct. In such a case, the corporation itself cannot be considered the wrongdoer. If the corporation has formulated policies and directed its employees properly, no purpose would be served by imposing punitive damages against it except to increase the amount of the judgment.

*Id.* at 653. Thus, the maritime rule in the Fifth Circuit precludes a finding of punitive damages against an employer unless wanton conduct derived from corporate policy and/or a corporate official with policy-making authority participated in, approved of, or subsequently ratified the egregious conduct. *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 21 F. Supp. 3d 657, 749 (E.D. La. 2014) (citing *P & E Boat Rentals* 872 F.2d at 651-52). Accordingly, there are two related issues before the Court: 1) Was there misconduct egregious enough to support a claim for punitive damages? 2) If so, can such conduct be imputed to the Board?

## IV. PRESENT MOTION

In their claim for punitive damages, the Claimants allege that the Board intentionally and wilfully violated 33 C.F.R. § 117 by "instituting an official policy…that prohibited its bridge

tenders, including those employed at the Florida Avenue Bridge, from raising the bridge to its maximum allowable height. (R. Doc. 150).  Claimants aver that this wilful violation of regulation, in combination with the fact that it "wilfully failed to provide any training to its bridge tenders…and/or provided grossly inadequate training" justifies the award of punitive damages.  In this case, there is a genuine dispute as to material facts regarding whether the Board properly trained its employees, formulated the appropriate policies, and enforced those policies.

V.    ANALYSIS

   a. **Material Facts are in Dispute**

As part of their claim for punitive damages, the claimants allege that the Board intentionally and willfully violated 33 C.F.R. § 117 by instituting an official policy that prohibited bridge tenders from raising the Bridge to its maximum allowable height.  33 C.F.R. § 117.5 provides that "drawbridges must open promptly and *fully* for the passage of vessels when a request or signal is given…"  33 C.F.R. § 117.5 (emphasis added).  There are issues of material fact with respect to whether the Board's policy for operating of the Bridge was in strict compliance with the regulation.  The Board's policy, as specified in the 1999 Bridge operator's manual, was to require bridge tenders to open the Bridge to its fullest extent. (R. Doc. 215-1 at 13).  The Board claims, in essence, that the failure to follow the stated policy to open fully for every vessel is a result of a negligent tendency among the bridge tenders.  However, Claimants contend that this was not the policy or practice actually in place.  In an email dated October 22, 2009, the Bridge Engineer, Randy Songy ("Songy"), stated the following:

> Rope slippage was first noticed during construction, shortly after the bridge became operational, and "rope slip compensators" were installed to prevent this from affecting the Bridge control system.  The bridge operators were then instructed to raise the bridge to "Fully Open" during every marine opening, but during the past couple of years Link and Barnes have informed bridge operating personnel that raising the bridge to "Fully Open" at least once daily would be

>sufficient to reset the revolvers and prevent control system issues related to rope slippage.  Barnes now suspects that bridge operators have not been raising the bridge to "Fully Open" at least once daily, and they are recommending that each bridge operator be instructed to do so during the first marine opening of their shift (3 times daily) to prevent recurrence of this problem.

(R. Doc. 219-3 at 18).  Songy's email, copying Dunn, the Director of Port Development, suggests that the Board (a) knew the Bridge was not being raised to "fully open" even once a day in contravention of federal regulation and (b) instituted a policy to raise the Bridge fully only once a shift.  Therefore, the Bridge cannot establish for purposes of summary judgment that its management was unaware of the tenders' failure to follow the Bridge's policy.

The Claimants further allege that the Board's recklessness resulted in inadequately trained bridge tenders creating their own policy of either asking vessel masters for their desired height clearance and raising the Bridge anywhere from five to twenty feet above the number or raising the Bridge based on visual estimation of the required clearance with no master input.  (R. Doc. 221 at 11).  Ryan Blysma ("Blysma"), Manager of Facility Services, testified as follows about the Port's policy on raising the Bridge:

>Q. Do you know whether or not the common practice of Florida Avenue Bridge operators at that time was to do exactly what Miss Craft did, request a vertical clearance from a vessel captain, add a certain number of feet, and then raise the Bridge to that level?
>A. There were many – there were also times where I heard, prior to even being asked, the vessel operators would give a height to the Bridge.  Their initial call would say, Florida Avenue Bridge, I need an opening of "X" height, without being prompted.

(R. Doc. 223-4 at 7).  At the very least, Blysma, who according to the Board was responsible for setting Board policy, acknowledges awareness of the practice of bridge tenders regularly not opening the Florida Avenue Bridge to its fullest extent, in violation of federal regulations.

Additionally, there is a genuine dispute as to the material facts regarding the training of the bridge tenders.  Brandy Craft, the bridge tender on duty at the time of the allision testified

that her training consisted of observing an existing bridge tender perform bridge tender functions at the Florida Avenue Bridge for a few weeks and did not utilize any manuals or documents. (R. Doc. 223-8 at 4). She further testified that there were no interoffice communications directing bridge tenders to open the bridge fully or raise it to the fullest extent. *Id.* When Craft was asked "[w]hat specific instruction, if any, can you recall being given about how high you should open the Florida Avenue Bridge in a given passing situation," she responded, "[o]nce the boat captain will call for a clearance you would go at least fifteen, ten to fifteen feet above what they would call for an opening." The Board contends that it instructed bridge tenders to stop the Bridge a few feet below the maximum of 157 feet. (R. Doc. 215-1 at 15). However, Craft's testimony suggests that she was trained by Johnson and others to interact with the captain of a vessel, obtain an estimated height and open the Bridge a distance above the estimated height.

Finally, there is some dispute regarding the Board's corporate structure and policy-making responsibilities. The Board asserts that Blysma, the manager of Facility Services, was responsible for evaluating Johnson's, the manager of Bridge Operations and Maintenance, performance. (R. Doc. 215-2 at 6). Whereas Claimants contend that Dunn, as Deputy Director of the Port Development Division, reviewed Johnson's performance evaluations and was ultimately responsible for overseeing Johnson's department. (R. Doc. 221-7 at 5). According to the Board, policy regarding the Bridge was set by the former manager of Facilities Operations, David Guarino ("Guarino") and his successor, Blysma. Claimants acknowledge that Guarino created the 1999 bridge operators manual but assert that it was not used by any of the tenders in training or actual job performance. *Id.* Blysma authored a new bridge operations manual but it was not in effect at the time of the allision. *Id.* The Board avers that Blysma was responsible for drafting the updated August 2014 bridge tenders' manual. However, the Claimants contend that

he did so with significant input from Songy and Johnson and that Songy and Johnson had principle authorship with regard to the section of the manual about bridge operations. *Id.* The manuals drafted by Guarino, and then Blysma required the approval of the Director of Port Operations before they were implemented. *Id.* While the parties agree that Johnson's job included overseeing the maintenance and operations of the Board's bridges and supervising the bridge operators, the Claimants assert that his job also included hiring and firing all bridge tenders, overseeing training of new bridge tenders, and authoring and enforcing bridge operations policy. *Id.* at 6.

### b. Was the Board's Misconduct Willful, Grossly Negligent, or Reckless?

Drawing all reasonable inferences in favor of the opponent, it is possible to conclude that policy-making personnel, such as Blysma, were (1) aware of the fact that bridge tenders were making partial openings based on verbal communications with captains in violation of 33 C.F.R. § 117 and (2) ratified this practice by failing to address it. However, this possibility does not end the Court's inquiry. The question remains whether this practice is sufficiently egregious to permit punitive damages.

In *In re Oil Spill*, the Eastern District, in discussing the standards of conduct that would give rise to punitive damages, defined both willful misconduct and gross negligence. 21 F. Supp. 3d 657, 732-33 (E.D. La. 2014).[1]

"Gross negligence" is an extreme departure from the care required under the circumstances or a failure to exercise even a slight care. *Id.* at 741. Gross negligence differs from ordinary negligence in terms of degree, and both are different in kind from reckless,

---

[1] Although the case centered on whether an award of punitive damages was justified under the Clean Water Act, the court noted that "[b]ecause the CWA is a federal statute that applies uniformly across all states, interpreting the statutory terms 'gross negligence' and 'willful misconduct' is a matter of federal law and should be based on a uniform interpretation of the terms, as opposed to, for example, the tort law of the state where the conduct or spill occurred." *Id.* at 734.

wanton, and willful misconduct. *Id.* at 735. Gross negligence is commonly defined as very great or excessive negligence, or as the want of, or failure to exercise, even slight or scant care or slight diligence. *Id.* at n. 180.

In *Maritrans Operating Partners v. Diana T. M/V*, the court declined to award punitive damages when a barge, being pushed by the defendant's vessel allided with the plaintiff's vessel. No. CIV. A. 97-1916, 1999 WL 144458 (E.D. La. Mar. 15, 1999). The claim for punitive damages was based on the plaintiff's assertion that the defendant had failed to require the captain of the defendant's vessel to take and pass a pre-employment drug screening or conduct any random drug screens. The post-accident drug test indicated that the captain was impaired at the time of the accident because of high levels of THC (the active intoxicant in marijuana). Plaintiff argued that had the Defendant conducted a drug screening, as required by federal regulations, it would have learned of the captain's drug use, and could have prevented the captain's impaired operation of the vessel and the allision. *Id.* at * 12-14. Reasoning that it was "understandable that [a small company] would be unaware for several years that federal regulations required it to drug-test its employees, the court held that

> while the failure for a small company like Pelican to drug-test its employees is certainly negligent, it is not grossly negligent in the particular situation at hand. Nor would awarding punitive damages serve as an effective deterrent, as the already substantial judgment against Pelican and the costs of litigation are deterrent enough for a small company.

*Id.* at *8. Likewise, in the present case, while the Board may have been negligent in its failure to prevent its bridge tenders from violating federal regulations, there is insufficient evidence to indicate that the Board's conduct was "an extreme departure from the care required under the circumstances or a failure to exercise even slight care." Claimants argue that *Maritrans* is distinguishable from the present matter, which involves the systemic failure to follow federal

regulations over many years as opposed to an isolated instance of alleged failure. However, while the failure to comply with 33 C.F.R. § 117 is likely evidence of negligence, it is not evidence of gross negligence. If failing to conduct a drug test in violation of federal regulations is not gross negligence, then a practice or policy of not opening the bridge fully in violation of federal regulations cannot be gross negligence where full openings may have caused damage to the bridge and there was no reason to believe the policy would pose a serious risk to others.

"Willful misconduct" is an act, intentionally done, with knowledge that the performance will probably result in injury, or done in such a way as to allow an inference of reckless disregard of the probable consequences. If the harm results from an omission, the omission must be intentional, and the actor must either know the omission will result in damage or the circumstances surrounding the failure to act must allow an implication of reckless disregard. *Id.* at 733. Willful misconduct includes both intentional and reckless conduct.[2] As there are no allegations that the Board acted intentionally, the question before the Court is whether the Board acted in reckless disregard of the safety of others.

In *Exxon Shipping v. Baker*, the Court affirmed a jury award of punitive damages for the reckless conduct of an inebriated captain who inexplicably "left the bridge and went down to his cabin" two minutes before a required turn of the tanker, which resulted in the accident that caused a disastrous oil spill. 554 U.S. 471 (2008). Further justifying punitive damages was the fact that Exxon knew that the captain was a relapsed alcoholic. In *Baker*, the Court looked to the Second Restatement's definition of recklessness:

---

[2] "While, in theory, gross negligence and willful and wanton misconduct are distinct concepts with different legal bases, in practice there has been much confusion and unfortunate overlap between the two doctrines. Part of the difficulty stems from the fact that the labels are sometimes used interchangeably, with 'gross negligence' defined in 'willful and wanton misconduct' terms. The designation of wanton acts as 'gross negligence' is a misnomer, because such acts are not negligence at all." 57A Am.Jur.2d *Negligence* § 235

> Recklessness may consist of either of two different types of conduct. In one the actor knows, or has reason to know…of facts which create a high degree of risk of…harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk. In the other the actor has such knowledge, or reason to know of the facts, but does not realize or appreciate the high risk of degree involved, although a reasonable man in his position would do so.

*Id.* (quoting Restatement (Second) of Torts § 500 cmt. a (1965)). Here, there is no evidence that the Board knew or had reason to know that its operation of the Bridge presented a high risk of harm. There were no prior accidents or near misses that indicated the way in which the bridge tenders were raising the Bridge created a high risk of allision with the lift span. There is also no evidence that the Board knew facts that indicated a high degree of risk and failed to realize the risk. The Bridge had operated from its commissioning in 2005 to 2014 without major incident. Even assuming that the Board trained its bridge tenders or ratified their practice to only raise the Bridge to a safety margin above a requested height (which conflicted with federal regulations), this is distinct from the recklessness in *Baker*, when Exxon allowed a known relapsed alcoholic to captain a vessel with millions of barrels of crude oil, ignoring the serious risk of an oil spill.

In *In re Oil Spill*, the court determined that BP Well Site Leaders (the "Leaders") were reckless and grossly negligent during the drilling of the Macondo well, which caused the failure of the blowout preventer, and a subsequent explosion and oil spill. 21 F. Supp. 3d 657 (E.D. La. 2014). Motivated by profit, the Leaders continued to drill the well another 100 feet despite significant well pressure issues, ignored those well pressure issues during the conversion of the float collar from a two-way valve to a one-way valve, and then did not verify that the float collar had been successfully converted. *Id.* at 674, 683. Thereafter, despite the signs of mechanical failures, the Leaders moved forward and allowed the pouring of cement into the well casing. *Id.* at 686-90. As a result, the cement was improperly poured. Moreover, this defective pouring was not discovered until too late because the Leaders elected not to conduct a cement bond log

("CBL") despite the fact that it was standard procedure to do so. The court found that the decision not to perform the CBL was a substantial cause of the blowout, explosion, and oil spill. *Id.* at 690. In contrast to *In re Oil Spill*, there is no evidence that the Board made risky decisions motivated by profit and/or ignored any indications that its operation of the Bridge posed any threat of serious accident.

## VI. CONCLUSION

Thus, despite factual disputes with respect to whether any policy-making officials ratified the practice of not raising the Bridge to the fullest extent with every opening there was a practice to determine the desired height and to add a safety factor to safety clear the transit. Although the appropriate height was not achieved by the bridge tender in this case and the actions or inactions may be negligent, there is no basis to find willful misconduct or gross negligence of the Board as those terms have been construed. Accordingly, the Board's Motion for Summary Judgment on punitive damages is GRANTED.

New Orleans, Louisiana, this <u>14th</u> day of <u>October</u>, 2015.

*[signature: Eldon E. Fallon]*
UNITED STATES DISTRICT JUDGE