**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

MICHELLE COLLINS, INDIVIDUALLY AND * CIVIL ACTION
AS PERSONAL REPRESENTATIVE OF THE ESTATE *
OF MICHAEL COLLINS *
 *
VERSUS * NO. 14-1900
 *
A.B.C. MARINE TOWING, L.L.C. AND * SECTION:  "L" (3)
BOARD OF COMMISSIONERS PORT *
OF NEW ORLEANS *

**ORDER & REASONS**

Before the Court is a Motion for Reconsideration (R. Doc. 274) regarding the Court's

October 14, 2015 ruling, wherein this Court granted summary judgment in favor of the Board of

Commissioners of the Port of New Orleans (the "Board"), dismissing all punitive damages

claims against the Board relating to the fatal allision of August 13, 2014.  The Court has heard

the parties on oral argument and reviewed the briefs and the applicable law and now issues this

Order and Reasons.

**I. BACKGROUND**

 **a.  Statement of Facts**

This case arises out of a fatal allision with the Florida Avenue lift bridge, which spans the

Inner Harbor Navigational Canal in Orleans Parish, Louisiana.  On, or about, August 12, 2014,

the M/V COREY MICHAEL ("COREY MICHAEL") was towing the 4600 Ringer Crane Barge

and Manitowic 4600 Ringer Crane (collectively the "Crane Barge") through the Canal from the

Intercoastal Waterway towards the Mississippi River.  The COREY MICHAEL was owned and

operated by ABC Marine Towing, L.L.C ("ABC Marine") whereas the Crane Barge was owned

by Boh Bros. Construction Co. ("Boh Bros.").  At approximately midnight on August 13, 2014,

the mast of Crane Barge allided with the bridge, causing the crane boom to fall onto the pilot house from which Captain Michael Collins was operating the CORY MICHAEL, which resulted in his death.

In 2004, the current Florida Avenue lift bridge (the "Bridge") was installed to replace the bascule drawbridge. (R. Doc. 215-2 at 1). Following the installation of the current lift bridge, Barnes Electric, the company charged with the maintenance and repair of the Bridge, trained the existing bridge tenders on the proper operation of the new Bridge. *Id.* The parties dispute the substance of this training. (R. Doc. 221-7 at1). According to Charles Johnson ("Johnson"), the Board's Manager of Bridge Operations and Maintenance, Barnes Electric trained the bridge tenders to raise the bridge to its maximum height on each opening and placed a written set of step-by-step procedures for the operation of the Bridge on the operator's console in the Bridge tender's house. (R. Doc. 215-2 at 1). However, according to the testimony of the bridge tenders, there were no step-by-step instructions on the bridge console; and, an email from the Board's Manager of Engineering Services indicates that Barnes instructed the bridge tenders that raising the bridge to its maximum height once a day was sufficient. (R. Doc. 221-7 at 1).

The Bridge's Operator Manual, which became effective in 1999 (when the bascule bridge was in operation) and was not revised until after the allision, specified that the Bridge be opened to its fullest extent for each opening. (R. Doc. 215-2 at 2). However, several bridge tenders testified that they did not review any operating or policy manuals as part of their bridge tender training. (R. Doc. 221-7 at 2). The parties also dispute when Johnson would turn over the training of a newly hired bridge tender to a senior bridge tender. *Id.* at 3. At the very least, Johnson would turn over the training to a senior person after determining that the hire was timely and showed up for work as expected. *Id.* After training had been turned over to the senior

bridge tender, Johnson's oversight over training consisted of discussions between him and the senior bridge operator regarding whether the new bridge tender was learning how to operate the bridge and whether the new tender was becoming comfortable with the job.  (R. Doc. 215-2 at 3).  It is disputed whether or not Johnson would perform any type of job evaluation of the newly hired bridge tenders.  (R. Doc. 221-7 at 3).

The Bridge was designed to allow the lift span to rise to a maximum height of 157 feet. (R. Doc. 215-2 at 3).  However, the Bridge had chronic mechanical issues that affected its ability to raise to its maximum vertical height.  (R. Doc. 215-1 at 6).  As explained by the Board's Bridge Engineer, Randy Songy, two problems led to the mechanical issues: the limit switches and the resolvers.  *Id.*  The limit switches are devices that stop the Bridge from being raised beyond its capacity.  (R. Doc. 215-2 at 3).  When the limit switch malfunctions, the effect is that the Bridge is allowed to rise beyond its maximum height of 157 feet, resulting in the Bridge damaging itself.  *Id.*  The resolvers are devices that are attached to the mechanical parts that lift each end of the Bridge.  *Id.*  The resolvers feed information back to the computer, which controls the motors to keep the Bridge level as it rises, thus preventing the Bridge from skewing.  *Id.*  The problems with the limit switches and resolvers are related.  *Id* at 4.  When they both malfunction, the Bridge tilts, and the malfunctioning limit switch fails to prevent the elevated side of the Bridge from rising past the limit.  *Id.*

Rather than risk damage caused by skewing, bridge tenders stopped raising the Bridge to its maximum height.  The parties dispute how this practice came to be.  Catherine Dunn ("Dunn"), the Director of Port Development, testified that she understood that the tenders were instructed to raise the Bridge within two feet of its maximum height.  (R. Doc. 215-6 at 4). However, Dunn also testified that Johnson informed her that he instructed the tenders to add 15-

20 feet above the clearance requested by vessel captains.  (R. Doc. 221-4 at 17-18).  Three

tenders confirmed this practice, testifying that they were trained to ask a vessel for their desired

clearance and then raise the Bridge several feet above the requested height. (R. Doc. 221-7at 3-

4).

　　　　On the night of August 13, 2014, the bridge tender, Brandy Craft ("Craft") was following

the practice, created, implemented and used by other bridge tenders, of opening the Bridge to a

height requested by the transiting vessel plus a safety margin.  (R. Doc. 215-2 at 4).  According

to Craft, Captain Collins of the CORY MICHAEL called Craft and asked for a 68 foot opening.

*Id.* at 5.  There is no corroboration that this conversation occurred.  (R. Doc. 221-7 at 4).

However, it was not unusual for a tender to obtain a vertical clearance from a vessel captain.  *Id.*

Craft then proceeded to raise the Bridge to 72 feet.  *Id.* at 5.  The mast of the Manitowoc 4600

Ringer Crane aboard the barge was 86 and a half feet tall.  (R. Doc. 215-2 at 5).  Unfortunately,

because the Bridge was elevated only to 72 feet, the mast of the crane came into contact with the

Bridge, causing the cable suspended boom to collapse on the raised pilot house, over which the

boom was positioned.  The weight of the collapsing boom crushed the elevated pilot house of the

COREY MICHAEL, and killed its occupant, Captain Michael Collins.  In addition, Boh Bros.'

4600 Ringer Crane Barge sustained heavy damage.

### b.  Procedural History

　　　　Decedent's widow, Michelle Collins, sued ABC Marine as decedent's Jones Act

employer/vessel owner alleging negligence under the Jones Act, 46 U.S.C. § 30104, et seq., and

vessel unseaworthiness; sued Boh Bros. as owner of the Crane Barge alleging general maritime

law negligence; and sued the Board as owner and operator of the Bridge alleging general

maritime law negligence.  Following discovery, on July 8, 2015, Michelle Collins, individually

and as personal representative of decedent Michael Collins filed her Second Amended Complaint, and Boh Bros. filed its Second Supplemental Answer, Cross-claim, and Third-Party Complaint.  (R. Docs. 148, 150).  In both second amended pleadings, Michelle Collins and Boh Bros.  ("Claimants") allege gross negligence by the Board and seek punitive damages. (R. Doc. 148).  By Order and Reasons dated October 14, 2015, this Court granted the Board's Motion for Summary Judgment on the issue of punitive damages, holding that there is no basis to find willful misconduct or gross negligence on the part of the Board in failing to require its bridge tenders to raise the Florida Avenue Lift Bridge to its fullest extent with each opening.  In the present motion, Boh Bros. and the Plaintiffs request that the Court reconsider its ruling on punitive damages and permit the issue of punitive damages to proceed to trial.

## II.   LEGAL STANDARD

Motions asking a court to reconsider an order are generally analyzed under the standards for a motion to alter or amend a judgment pursuant to Rule 59(e) or a motion for relief from a judgment or order pursuant to Rule 60(b). *See Hamilton Plaintiffs v. Williams Plaintifs,* 147 F.3d 367, 371 n. 10 (5th Cir.1998). Rule 59(e) governs when the motion is filed within 28 days of the challenged order. *See* Fed.R.Civ.P. 59(e). Because Defendants' Motion was filed within 28 days of entry of the Order and Reasons it challenges, the Court treats the Motion as one pursuant to Rule 59(e).

A Rule 59(e) motion "is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." *Templet v. HydroChem Inc.,* 367 F.3d 473, 479 (5th Cir.2004) (citing *Simon v. United States,* 891 F.2d 1154, 1159 (5th Cir.1990)). Rather, Rule 59(e) serves the narrow purpose of correcting manifest errors or law or fact, or presenting newly discovered evidence. *Lavespere v. Niagra Mach. &*

*Tool Works, Inc.,* 910 F.2d 1667, 174 (5th Cir.1990); *Templet,* 367 F.3d at 479 (quoting *Waltman v. Int'l Paper Co.,* 875 F.2d 468, 473 (5th Cir.1989)). " 'Manifest error' is one that 'is plain and indisputable, and that amounts to a complete disregard of the controlling law.' " *Guy v. Crown Equip. Corp.,* 394 F.3d 320, 325 (5th Cir.2004) (quoting *Venegas–Hernandez v. Sonolux Records,* 370 F.3d 183, 195 (1st Cir .2004)). In the Fifth Circuit, altering, amending, or reconsidering a judgment under Rule 59(e) "is an extraordinary remedy that should be used sparingly." *Templet,* 367 F.3d at 479 (citing *Clancy v. Empl'rs Health Ins. Co.,* 101 F.Supp.2d 463, 465 (E.D.La.2000)). "A Rule 59(e) motion should not be used to re-litigate prior matters that ... simply have been resolved to the movant's dissatisfaction." *Voisin v. Tetra Technologies, Inc.,* 2010 WL 3943522, at *2 (E.D.La. Oct.6, 2010). District courts have "considerable discretion in deciding whether to grant or deny a motion to alter a judgment." *Hale v. Townley,* 45 F.3d 914, 921 (5th Cir.1995). Yet at the same time, the Rule 59(e) standard "favors denial of motions to alter or amend." *S. Constructors Group, Inc. v. Dynalectric Co.,* 2 F.3d 606, 611 (5th Cir.1993).

### III.   ANALYSIS

Preliminarily, Boh asserts that this case involves the knowing, continuous violation of a clearly defined safety regulation imposed by law, aimed at ensuring safe navigation of marine vessels down the Industrial Canal in New Orleans.  Title 33 C.F.R. § 117.5, which provides that "drawbridges must open promptly and *fully* for the passage of vessels," recognizes that the safe operation of the Florida Avenue Lift Bridge requires that the Bridge open to the fullest extent for the passage of *all* vessels at *all* times, rather than relying on the eyeballing skills of the bridge operator and/or a pilot's vertical height estimate of a vessel and its cargo.  Notably, the fatal

allision that forms the basis of this lawsuit would likely not have occurred but for the failure of the Board to enforce this safety regulation.

In the October 14, 2015 Order and Reasons, this Court held that "there is insufficient evidence to indicate that the Board's conduct was an extreme departure from the care required under the circumstance or a failure to exercise even slight care'"  In so holding, the Court noted that there did exist genuine issues of material fact as follows:

> There are issues of material fact with respect to whether the Board's policy for operating the Bridge was in strict compliance with the regulation.
> …
> Drawing all reasonable inferences in favor of the opponent, it is possible to conclude that policy-making personnel, such as Blysma, were (i) aware of the fact that bridge tenders were making partial openings based on verbal communications with captains in violation of 33 C.F.R. § 117 and (ii) ratify this practice by failing to address it.

However, despite the issues of material fact, the Court ruled, as a matter of law, that the practice of failing to lift the Bridge to its "maximum allowable height" was not "sufficiently egregious" based on the following reasons:

> There is no evidence that the Board knew or had reason to know that its operations of the Bridge presented a high risk of harm.

> There were no prior accidents or near misses that indicated the way in which the bridge tenders were raising the Bridge created a high risk of allision.

> The Bridge had operated from its commissioning in 2005 to 2014 without major incident.

> Even assuming that the Board trained its bridge tenders or ratified that practice to only raise the Bridge to a safety margin above a requested height (which conflicted with federal regulations), this is distinct from the recklessness in *Baker*, when Exxon allowed a known relapsed alcoholic to captain a vessel with millions of barrels of crude oil, ignoring the serious risk of an oil spill.

> In contrast to *In re Oil Spill*, there is no evidence that the Board made risky decisions motivated by profit and/or ignored any indications that its operation of the Bridge posed any threat of serious accident.

Implicit in the prior Order and Reasons is the recognition that this Court's ruling likely would have been different had the Court been presented with evidence that the Board ignored *known* risks of serious harm in failing to insure that bridge tenders complied with the mandate of 33 C.F.R. § 117.5 in opening the Bridge fully.

Significantly, in the present motion, Boh introduces new video evidence of the Bridge taken on July 17, 2015, less than a year after the fatal allision, which shows three vessels passing underneath the Bridge while it is in half-raised position.  Therefore, notwithstanding the fatal tragedy that is the basis of this case, the video footage demonstrates that the Board continues to disregard the mandate of 33 C.F.R. § 117.5.  The Court appreciates the Board's argument that this video footage is inapposite because it was taken on a day when the Bridge was undergoing electrical repairs.  However, the Court notes that any conclusions it might draw from this video footage would be based on material facts in dispute.  In other words, whether or not this evidence confirms that the Board had in the past and continues to act with reckless conduct and callous disregard for life and property sufficient to justify an award of punitive damages is not an issue that can be determined summarily at this time in view of their arguably continuing practice.  Rather, this new evidence, particularly taken together with the genuine issues of material fact discussed in the October 14 Order & Reasons, introduces a new fact issue that must be decided at trial.

## IV.    CONCLUSION

Considering the foregoing, **IT IS ORDERED** that the Motion for Reconsideration (R. Doc. 274) is **GRANTED** and the issue of punitive damages will proceed to trial.

New Orleans, Louisiana, this 17th day of December, 2015.

UNITED STATES DISTRICT JUDGE